IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| DARLENE B. FARMER, | ) Civil Action No. 3:08-739-CMC-JRM |
| Plaintiff, | ) |
| v. | ) **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) |
| Defendant. | ) |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

**ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for DIB on May 19, 2005, and SSI on July 13, 2005. Plaintiff's applications were denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). After a hearing held September 6, 2007, at which Plaintiff appeared and testified, the ALJ issued a decision dated September 21, 2007, denying benefits. The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff can perform. On January 31, 2008, the Appeals Council denied Plaintiff's request for review, thereby making the determination of the ALJ the final decision of the Commissioner. Plaintiff filed this action on March 4, 2008.

# FACTUAL BACKGROUND

Plaintiff was forty-three years old at the time of the ALJ's decision. She has a twelfth grade education plus college attendance, and past relevant work as an administrative clerk, a clerk, a document control assistant, a secretary, and an administrative assistant. Plaintiff alleges disability since August 1, 1999, due to a "broken neck," diverticulitis, and rheumatoid arthritis.

# ALJ's FINDINGS

The ALJ found (Tr. 14-16, 20-21):

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2004.

2. The claimant has not engaged in substantial gainful activity since August 1, 1999, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease with history of cervical fusion and schizoaffective disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to work with restrictions requiring lifting, carrying, and/or handling of 20 pounds occasionally and 10 pounds frequently; avoidance of hazards such as heights or hazardous machinery; no climbing or balancing; no operation of automotive equipment; and no contact with the public. Due to the claimant's mental disorder, she would be limited to unskilled work with an SVP of 1 or 2.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 3, 1964 and was 35 year old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

2

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## **STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a), 416.905(a), see Blalock, 483 F.2d at 775.

## **MEDICAL EVIDENCE**

Plaintiff sought treatment at the Aiken Regional Medical Center ("ARMC") in September 2000 for neck pain. She reported that she had been in a motor vehicle accident in 1998, at which

3

time she fractured her C7 vertebra. Cervical CT scan and myelogram revealed mild spondylosis, and either unfused apophysisis (outgrowth) or status post clay shoveler's type fracture at C7.

On June 27, 2001, an MRI revealed evidence of a prior fusion at C5-C6, a small osteophyte at C4-5, mild congenital disc space narrowing, the absence of disc fragment or nerve root compression, and a stable post-operative appearance. Tr. 135-136. Plaintiff underwent a cervical diskectomy, cervical fusion, and removal of cervical orthopedic hardware in August 2001. Tr. 115-118.

Plaintiff was treated at the Southern Neurologic Institute in Aiken from September 6, 2000 to August 24, 2005 by Dr. Franklin M. Epstein (a neurosurgeon) and Dr. Allen L. Sloan (a pain management specialist). Dr. Epstein noted that Plaintiff recently underwent a myelogram which showed a fusion with anterior plating from C4 to C6 and straightening of a normally lordotic posture. He increased Plaintiff's medication (Elavil and Zoloft). On October 11, 2002, Dr. Epstein referred Plaintiff to a chiropractor and to Dr. Sloan for pain management. Tr. 301.

On December 16, 2004, Plaintiff complained of significant knee pain and persistent neck and low back pain. Dr. Sloan's impression was painful osteoarthritic degenerative knees and cervical spondylosis with radiculopathy. He performed bilateral Hyalgan injections of Plaintiff's knees. Tr. 281. Additional knee injections were done on December 29, 2004. Tr. 279.

On December 23, 2002, Dr. Sloan increased Plaintiff's Zoloft dosage and prescribed Duragesic patches. On January 30, 2003, Dr. Sloan performed a C6-7 midline cervical epidural injection. Tr. 298. Plaintiff reported excellent results from the injection. On April 3, 2004, Dr. Sloan increased Plaintiff's Duragestic patch to every two days, instead of every three. Tr. 297. Epidural injections were given in June, July, and December 2003, and March and July 23, 2004. Plaintiff reported excellent results. Tr. 287-295.

After Plaintiff complained of pain in her shoulders in August 2004, Dr. Sloan performed bilateral suprascapular injections and increased the dosage of Plaintiff's Duragesic patches. Tr. 285-286. On September 21, 2004, an MRI revealed minor anterior subluxation of C3 on C4 and post-diskectomy and anterior cervical fusion from C4 through C6. Tr. 284. Additional cervical epidural injections were performed in January and April 2005. Tr. 269-270, 277-278.

Plaintiff switched her health care provider to Dr. Stefan L. Montgomery, a family physician and sports medicine specialist, on October 27, 2005. He provided treatment for her physical and mental impairments. Dr. Montgomery continued Plaintiff on Duragesic, Percocet, Provigil, Celebrex, Lexapro, and Pamelor and added Zyprexa on that date. Tr. 218-219. On November 4, 2005, it was noted that Plaintiff's mood was still slightly anxious and her Zyprexa was increased. She was also prescribed Zelnorm for abdominal pain. Tr. 217.

Plaintiff's mood was still anxious on November 18, 2005. Dr. Montgomery gave Plaintiff a medication refill and increased her Zyprexa. Tr. 216. On December 16, 2005, it was noted that Plaintiff was smiling, but her mood was still anxious. Tr. 215. On March 24, 2006, Plaintiff reported that she recently had been hospitalized for psychological treatment. Plaintiff's depression was reportedly improved, although she occasionally still heard voices telling her to hurt or kill herself. Her mood was noted to be anxious and depressed. Tr. 212. On June 30, 2006, Dr. Montgomery prescribed Dilaudid in conjunction with Duragesic Patches and Percocet for neck pain.

On July 28, 2006, Dr. Montgomery noted tenderness in the paraspinous muscles of Plaintiff's cervical region, pain with Spurling's testing[1] bilaterally, decreased range of motion of her cervical

---

[1]Spurling's test is an:
evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial
(continued...)

spine, possible decreased grip strength on the left, and numbness to light touch on her upper arm and forearm. Plaintiff reported that she was having problems with her mother, which was causing a lot of mental stress. She also reported suicidal ideation. Her pain level and ability to think was reportedly better on the Dilaudid, but it did not seem to last as long as Percocet. Tr. 198-199.[2] On October 5, 2006, Dr. Montgomery noted possible radiculopathy down Plaintiff's right arm with numbness in her right arm and right hand. Plaintiff reported to Dr. Montgomery that she had begun hearing voices again, which led to a recent hospitalization. Tr. 196-197.

On February 7, 2007, Plaintiff followed up with Dr. Montgomery for her schizoaffective disorder, as well as neck pain. She reported that the Mental Health Center had tried to adjust her medications, but she was suffering from a significant amount of depression. Her mother stated that Plaintiff had not been very interactive and did not want to get out of bed. Haldol was discontinued to see if that was the cause of her sedation. Tr. 192. On May 11, 2007, Plaintiff returned to Dr. Montgomery for follow-up after her most recent psychiatric hospitalization. Both her Cymbalta and Seroquel had been increased. Tr. 190.

Plaintiff was hospitalized several times and received treatment at the Aiken-Barnwell Mental Health Center ("ABMHC") for her psychological impairments. She was hospitalized at the G. Werber Bryan Psychiatric Hospital from March 18 to 24, 2003, for a possible suicide attempt

---

[1](...continued)
compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain.
Steadman's Medical Dictionary, 27th ed. (2000).

[2]On July 28, 2006, Dr. Montgomery also completed forms concerning Plaintiff's limitations from her impairments (see Tr. 202-210), discussed further below.

6

(overdose of pills). It was noted that Plaintiff had diagnoses of mood disorder secondary to general medical condition, undifferentiated schizophrenia, chronic neck pain, and social stressors (including problems with her significant other, unemployment, and residence with her mother). Examination revealed that Plaintiff was alert, although she was confused regarding her treatment. She denied pain. Plaintiff improved with medication and demonstrated no episodes of mania or depression. She was able to contract for her safety throughout her hospitalization and demonstrated a Global Assessment of Functioning ("GAF") of 75 (indicating slight impairment) on discharge. Tr. 305-315.

Plaintiff began outpatient therapy at the ABMHC, including examinations with Dr. Gregory Smith (a psychiatrist), on June 1, 2006. Dr. Smith noted that Plaintiff had mood symptoms as well as psychotic symptoms since at least the early 1990s.

Plaintiff was voluntarily hospitalized at ARMC between September 18 and October 4, 2006 for treatment of auditory hallucinations and medication adjustment. Tr. 163-168. Examination revealed decreased neck ranges of motion; a reported depressed mood; normal speech rate and tone; good eye contract; an affect congruent with her mood; intact memory; intact attention and concentration; logical and coherent thought; and absence of flight of ideas. Plaintiff denied visual hallucinations or paranoid or delusional thinking. Auditory hallucinations were determined to be controlled on discharge and Plaintiff's GAF had increased from 35 (some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood) to 50 (moderate symptoms). Her discharge diagnoses were chronic neck pain, irritable bowel syndrome, and moderate stressors. Tr. 163-168.

On October 13, 2006, Plaintiff reported to Dr. Smith that she had been hospitalized because she was suicidal. She complained of auditory hallucinations. Dr. Smith instructed Plaintiff to get involved in day treatment or a peer support program. Tr. 172-174.

7

Plaintiff was hospitalized at ARMC from May 1 to 8, 2007 for reported auditory hallucinations. Examination revealed a somewhat bizarre, vague, and ambivalent affect, but also that Plaintiff was oriented to place, had full neck ranges of motion, and had normal extremity strength. Plaintiff's medications were adjusted. Tr. 143-145.

On June 12, 2007, Dr. Smith noted that Plaintiff was quite distracted, could not keep her train of thought, did not make a lot of sense, and could not focus very well. Plaintiff had not gotten involved in any type of support group and Dr. Smith encouraged her to do so. Tr. 169-171.

A number of State agency physicians and psychologists reviewed Plaintiff's records and completed forms concerning her residual functional capacity ("RFC"). On October 31, 2005, Dr. Robert Kukla opined that Plaintiff retained the physical RFC to occasionally lift fifty pounds and frequently lift twenty-five pounds; stand and/or walk six hours in an eight-hour workday; push/pull within her lifting capacity; frequently balance, stoop, kneel, crouch, and climb ramps and stairs; and occasionally climb ladders, ropes, or scaffolds. He noted no manipulative, visual, communicative, or environmental limitations. Tr. 248-252.

On June 1, 2006, Dr. Darla Mullaney opined that Plaintiff retained the physical RFC to lift twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for six hours in an eight-hour workday; and occasionally climb ramps and stairs. Dr. Mullaney thought that Plaintiff could perform work not requiring concentrated exposure to hazards such as machinery and heights; crawling or reaching overhead; more than limited pushing/pulling with her upper extremities; or climbing of ropes, ladders, or scaffolds. No visual, communicative, or other environmental limitations were noted. Tr. 239-242.

On June 6, 2006, Dr. Lisa Smith Klohn, a State agency psychologist, opined that Plaintiff was not significantly limited as to her ability to adapt or as to her understanding and memory, except she

8

was moderately limited in her ability to understand and remember detailed instructions. Dr. Klohn thought that Plaintiff was not significantly limited as to her social interaction, except moderate limitations as to her ability to interact appropriately with the general public. As to maintaining sustained concentration and persistence, Dr. Klohn opined that Plaintiff's ability was not significantly limited to moderately limited. Dr. Klohn wrote that due to mood disorder and a history of substance abuse, Plaintiff would have difficulty with complex tasks, but should be able to attend to and perform simple, unskilled tasks for two-plus hours without special supervision. Tr. 234-236.

After the ALJ's decision, Plaintiff submitted additional records (from Dr. Montgomery and ABMHC) to the Appeals Council. On June 13, 2007, Dr. Montgomery saw Plaintiff with complaints of neck pain. Plaintiff's mother related that Plaintiff had disorganized thinking, problems finding the right words, and random thoughts and statements. Dr. Montgomery noted that Plaintiff had been to the Mental Health Center, but had not received much help with her depression or assistance with her medications. He was unsure if he should make changes to her medication regimen. Tr. 323. On July 18, 2007, Plaintiff reported to Dr. Montgomery that her depression was worse and her appetite was poor. She stated that she only wanted to stay in her room, sleep, and take medications. Plaintiff's thought processes, however, were noted to be much clearer than on her previous visit. Tr. 324. On September 25, 2007, Plaintiff reported to Dr. Montgomery that she had begun having panic attacks. Tr. 326.

In a letter dated October 3, 2007, Dr. Montgomery stated that Plaintiff was on chronic narcotics using Fentanyl patches 75 mcg every two days as well as breakthrough pain relief with Percocet or Dilaudid, taking as many as 4-6 of the breakthrough pain medications a day. He stated that this was a very high dose of narcotics and spoke to the level of pain Plaintiff was experiencing. Dr. Montgomery also wrote that Plaintiff has been dealing with psychiatric issues with multiple

9

hospitalizations for different psychotic problems where she heard voices and had extreme bouts of depression. He stated that "[i]t is strange that the findings that I noted (weakness of grip, tenderness, decreased range of motion) would not be considered with regards to her disability." Dr. Montgomery concluded that Plaintiff "certainly has the above mentioned findings that impair her ability to perform most activities." Tr. 321.

On October 22, 2007, Plaintiff complained to Dr. Smith of being more nervous and depressed. Plaintiff had begun attending a support group, but was unable to attend all sessions due to transportation difficulties. Dr. Smith noted that Plaintiff appeared to be more logical, less scattered, and less sedated than she had been in the past. Tr. 329-331.

## **HEARING TESTIMONY**

Plaintiff testified she stopped working at Savannah Riverside, where she performed administrative/clerical type work, because she was in too much pain and could no longer perform her duties. Tr. 340-341. She underwent two neck surgeries and had screws in her neck which kept her from turning her head and caused her significant pain. Tr. 342. Plaintiff said she had trouble remembering and concentrating, suffered from depression, had panic attacks, had headaches, and suffered from arthritis. Tr. 342. She experienced side effects from her medications, including dizziness, drowsiness, confusion, and forgetfulness. Tr. 353. Plaintiff said she had not driven in a year due to safety issues, including not being able to turn her head fast enough and having anxiety attacks (which she said occurred one to two times a day and lasted for forty-five minutes at a time). Tr. 350-351.

Plaintiff testified she could lift three pounds, sit for thirty minutes, and walk one-half mile. Tr. 351-352. She said she performed limited household cleaning, watched television, read, knitted, attended church services, and prepared meals. Tr. 344, 347-349.

<em>10</em>

**DISCUSSION**

Plaintiff asserts that: (1) the ALJ erred in failing to give controlling weight to the opinions of her treating physician (Dr. Montgomery); (2) the ALJ failed to properly determine her RFC; and (3) her case should be remanded to consider evidence which was submitted to the Appeals Council. The Commissioner contends that the ALJ's decision is supported by substantial evidence.[3]

**A.     Treating Physician**

Plaintiff alleges that the ALJ erred in failing to properly assess the opinions of her treating physician, Dr. Montgomery. The Commissioner contends that the ALJ's decision to not given any weight to Dr. Montgomery's opinions is supported by substantial evidence because the opinions were inconsistent with Dr. Montgomery's own findings, Plaintiff's reports to him, and the favorable findings of other health care providers.

On July 28, 2006, Dr. Montgomery completed forms titled "Medical Certification Statement," "Clinical Assessment of Pain," and "Arthritis Residual Functional Capacity Questionnaire." Tr. 202-210. On the Medical Certification Statement, he wrote that Plaintiff was unable to perform the functions of her job because she was unable to lift, unable to walk for even short distances, unable to reach overhead, unable to move without pain, and unable to sit for prolonged periods. On the Pain form, Dr. Montgomery checked that Plaintiff's pain virtually incapacitated her, physical activity

---

[3]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

11

increased pain to such a degree as to require increased medication or substantial amounts of bed rest, medication would place severe limitations on her ability to perform even the most simple everyday tasks, pain would totally restrict her and make her unable to function at a productive level at work, and little improvement was likely.

On the Arthritis RFC, Dr. Montgomery opined that Plaintiff's prognosis was fair to poor; she had pain, depression, and fatigue; she had sharp pains in her neck that sometimes went down her arm; and her pain was worse with raising her arms or turning her neck. He identified positive objective signs including reduced range of motion in her neck, reduced grip strength, impaired sleep, weight change, tenderness, and muscle spasm. Dr. Montgomery opined that Plaintiff's pain was often severe enough to interfere with attention and concentration, and depression and schizoaffective disorder affected her pain. He thought Plaintiff was incapable of even low stress jobs due to constant pain that was sometimes severe and often moderate, an inability to lift, pain with neck movement such as computer work, and a constant need to change positions. Drowsiness and fatigue were indicated as side effects of her medications.

Dr. Montgomery estimated that Plaintiff could walk one city block without rest or severe pain, sit for ten minutes before needing to get up, stand for ten minutes at a time, stand and/or walk for less than two hours and sit for two hours in an eight-hour day. He thought that Plaintiff needed a job that would permit shifting positions at will from sitting, standing, or walking with breaks at least every hour (for fifteen to thirty minutes). Additionally, Dr. Montgomery opined that Plaintiff could lift less than ten pounds rarely; never climb ladders or stairs; rarely twist, bend, or crouch; and not reach overhead. He thought she had significant limitations in doing repetitive reaching, handling, or fingering.

12

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 416.927(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

In the ALJ's decision, "no weight" was given to Dr. Montgomery's assessments because Dr. Montgomery's treatment notes showed no basis for the physical limitations he imposed and physical examinations by Dr. Sloan contradicted Dr. Montgomery's opinions. The ALJ also appears to imply that Dr. Montgomery may have expressed his opinion to assist Plaintiff because he sympathized with her or to avoid unnecessary doctor/patient tension. Tr. 18.

13

The ALJ's decision to give no weight to Dr. Montgomery's assessments is not supported by substantial evidence. He states that Dr. Montgomery's opinion is not supported by his medical notes, but provides no discussion to explain this. In the recitation of medical evidence, the ALJ only references one visit by Plaintiff to Dr. Montgomery (her first on October 27, 2005). The ALJ also appears to ignore that, in his assessment, Dr. Montgomery cites to specific findings to support his opinion, including Plaintiff's decreased grip strength, muscle spasms, impaired sleep, weight change, and tenderness. Tr. 205. Dr. Montgomery also noted that Plaintiff experienced sharp pain mostly in her neck, but at times down the arms which was worsened with lifting her arms or turning her neck. Tr. 206. His records (that were before the ALJ) refer repeatedly to visits for neck pain; note that Plaintiff was placed on Flexeril for muscle spasms (Tr. 212); note numerous times when her medications were not working adequately and had to be changed; indicate that he continued to prescribe strong narcotic pain medications; and reference numbness (Tr. 198), possible reduced grip strength (Tr. 198), decreased range of motion of the cervical spine (Tr. 198), positive Spurling's sign (Tr. 198), and possible cervical radiculopathy (Tr. 196).

The ALJ discounted Dr. Montgomery's opinion because Dr. Sloan noted no obvious sensory or motor deficits globally, no abnormal reflexes, excellent results from injection therapy, only mild decreased range of motion in her cervical spine, good shoulder shrugs and grip strengths, and that she was neurologically intact. Tr. 18. Review of Dr. Sloan's records, however, reveals he noted that raising Plaintiff's arms above her head and abduction of her arms led to shoulder pain in December 2003. Tr. 300. In January and July 2003, he noted decreased range of motion of her cervical spine and tenderness with some radiation into her shoulder when turning her head side to side. Tr. 293, 298. On August 13, 2004, Dr. Sloan wrote that holding Plaintiff's head straight up, turning it side to side, and leaning it to the right caused a moderate degree of increasing pain; she had mild spasms

14

in the cervical area; and she had significant pain over her scapular notches. Tr. 285. Cervical radiculopathy was noted on numerous occasions. See Tr. 269-272, 285.

The ALJ also does not appear to acknowledge that a number of the limitations imposed by Dr. Montgomery may have been as a result of Plaintiff's mental impairments. Although Plaintiff received mental health care from Dr. Smith and during hospitalizations, Dr. Montgomery also prescribed medications for her mental impairments. Dr. Montgomery opined that Plaintiff's pain was affected these mental impairments.

Dr. Montgomery's records submitted to the Appeals Council also appear to support Dr. Montgomery's opinion.[4] In his October 2007 letter, Dr. Montgomery noted his findings including weakness of grip, tenderness, and decreased range of motion which he thought should be considered. Tr. 321. His treatment notes from July to October 2007 indicate Plaintiff was distracted and did not make sense, she had so much weight loss that an appetite stimulant had to be prescribed, and she reported panic attacks. Tr. 323-324, 326.

### B. RFC

Plaintiff alleges that the ALJ erred in making his RFC assessment because there was general ambiguity in the RFC findings, the ALJ failed to make a function-by-function assessment, and the ALJ failed to consider all of her impairments (especially osteoarthritis in her knees, depression, and possible bipolar disorder). The Commissioner contends that the ALJ was not required to include any limitations from Plaintiff's bilateral knee disorder in his assessment because

---

[4]The Commissioner contends that the Appeals Council was not required to provide specific findings concerning the new evidence and properly did not consider the evidence because it reveals no significant change in Plaintiff's condition and would not have changed the ALJ's decision. Here, however, Dr. Montgomery's October 2007 letter provides clarification as to his July 2006 opinions. His office notes appear to indicate symptoms of Plaintiff's psychological impairments and possible medication side effects.

15

no imaging supported it and she improved after knee injections, and the ALJ was not required to find any further mental limitations regarding any affective disorders because Plaintiff was able to contract for her safety, she denied suicidal ideation after treatment, she denied manic or hypomanic episodes, and she had a poor history for mania.

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis...." SSR 96-8. The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. Id.

Here, the ALJ does not appear to have properly considered Plaintiff's RFC. First, it is unclear whether he considered all of Plaintiff's alleged impairments including her non-severe impairments. "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p. Additionally, although the ALJ appears to have found that Plaintiff could perform a range of light work, he did not make any findings as to the amount of time in an eight-hour workday she could walk and/or stand, the amount of time she could sit, and whether she would need to alternate positions. The full range of light work "requires standing and walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to properly consider the opinions of Plaintiff's treating physician

16

(Dr. Montgomery) in light of all the evidence (including the additional evidence submitted to the Appeals Council) and to properly determine her RFC.

It is, therefore, RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and the case be **remanded** to the Commissioner for further administrative action as set out above.

                                                                  Joseph R. McCrorey
                                                                   United States Magistrate Judge

August 17, 2009
Columbia, South Carolina